Gants, J.
The plaintiff, Lantor Inc. (“Lantor”), has filed suit against the defendants, Richard M. Ellis (“Ellis") and NEPTCO, Inc. (“Neptco”), seeking injunctive relief to enforce its Non-Disclosure & Non-Compete Agreement with Ellis. Ellis challenges the enforceability of this Agreement and has counterclaimed against Lantor, alleging breach of his employment and resignation agreements.
On June 11, 1998, Judge Elizabeth Butler allowed Lantor’s request for a temporary order restraining Ellis:
1. “from engaging, and NEPTCO, Inc. from employing Ellis, in the sale, marketing, or manufacture of water blocking laminates used for water blocking tapes, personal care products, cable wraps, and filtration,” and
2. “from using, distributing, disclosing, or disseminating any proprietary, secret or confidential information of Lantor ...”
This temporary restraining order was later extended twice, until August 25, 1998 by Judge Paul Chernoff, with the agreement of the parties, and was again extended by me on August 25, 1998, at the close of the preliminary injunction hearing, pending this decision. For the reasons stated below, the motion for a preliminary injunction is DENIED and the extended temporary restraining order is hereby DISSOLVED.
FINDINGS OF FACT
“By definition, a preliminary injunction must be granted or denied after an abbreviated presentation of the facts and the law.” Packaging Industries Group, Inc. v. Cheney, 380 Mass. 609, 616 (1980). The preliminary findings of fact below are based on the many affidavits and attached exhibits furnished by the parties.
From 1987 until the summer of 1992, Ellis was Regional Sales Manager for Sumitomo Electric Fiber Optics Corporation, responsible for the sale of fiber optic cables, fusion splicing systems, and fiber optic connectors. In early September 1992, Ellis agreed to leave Sumitomo’s employ and accept Lantor’s offer of a position as Sales Manager for its Firet Laminated Products Group in North America.
Before Ellis commenced work with Lantor, they executed an undated letter agreement (referred to as the “letter agreement” or “employment agreement”) in which he was promised $65,000 per year, plus eligibility beginning in Lantor’s 1993 fiscal year in its Sales Incentive Program with no cap on his earnings potential, plus participation in an Objectives Program that would permit him to earn up to 15 percent of his base salary if he met four quantifiable objectives, plus other benefits. The duration of this employment agreement was two years, commencing September 21, 1992, “with an automatic one year renewal unless either parfy elects to give notification of termination in writing at least four months prior to the annual anniversary date of the agreement.” There were no provisions for termination of the agreement except through a decision not to renew.
Specifically incorporated by reference in this letter agreement was a Non-Disclosure & Non-Compete Agreement, executed on September 5, 1992. Under this Agreement, Ellis acknowledged that:
The “Business” in which he is/will be employed is defined as the sales, marketing and manufacturing of water swellable cellulosic and synthetic laminates used for water blocking tapes, personal care products, cable wraps, and filtration.
Ellis agreed that, for two years after the termination of his employment with Lantor:
he shall not in North America or in any other country where the Employee in the course of his employment hereunder has had direct business contacts, directly or indirectly, (i) engage in or market the Business for his own account; (ii) enter the employ of, or render any services to, any person engaged in such activities; or (iii) become interested in any such person in any capacity, including without limitation, as an individual, partner, shareholder, officer, director, principal, agent, trustee or consultant. . .
Ellis further agreed that he forever:
shall keep secret and retain in strictest confidence, and shall not use for the benefit of himself or others, all trade secrets and/or confidential information of the Corporation and its subsidiaries and other affiliates . . .
Ellis also agreed, for two years after the termination of his employment with Lantor, that he:
shall not, directly or indirectly, hire or solicit . . . any one who was an employee of the Business at any time [when Ellis worked at Lantor or two years before and thereafter] or encourage any current employee of the Corporation working for the Business to leave such employment. . .
In early April 1993, Willem Van Gelder, then Lantor’s Area Manager for North America, told Ellis that the Sales Incentive Program included in the letter agreement had to be changed to include a cap, because Lantor’s corporate parent did not permit any employee’s total bonus to exceed 50 percent of base salary. In a memorandum to Van Gelder on April 5, 1993, Ellis observed that Lantor was seeking unilat *223 erally to change a term of their employment agreement by imposing a cap on his Sales Incentive Program. He said, “I understand and accept this limitation,” but suggested a variety of changes to his Sales Incentive and Objectives Program to offset the loss he would suffer from a cap. Ellis’s memorandum triggered months of further discussion and correspondence regarding the renegotiation of his letter agreement. On November 19, 1993, Lantor confirmed in writing the changes that Ellis had agreed to accept in his employment agreement, which reflected in part the changes that Ellis put forth in his April 5 memorandum. Ellis accepted these changes in the agreement, recognizing that Lantor was not going to pay him a bonus beyond the 50 percent cap, that he faced termination if he did not ultimately accept the cap, and that these revisions were the best that could be achieved under the circumstances. He received bonuses under these modified terms for 1993, 1994, and 1995.
In the written give-and-take regarding the change in Ellis’s incentive plan, Ellis wrote Van Gelder on June 15, 1993:
Once I accept your proposed changes to that original agreement, what is there to prevent Lantor from deciding to change the compensation plan, or any other portion of the employment agreement, again at a later date? I am honestly confused about what to do.
Van Gelder responded in writing on July 15, 1993 to this concern:
The incentive program is an ongoing and integral part of your employment agreement, which means that Lantor cannot suddenly decide that it will no longer be applicable in a certain year.
Despite Van Gelder’s assurances, in or around December 1995, Lantor again proposed unilaterally to change the incentive program in Ellis’ employment agreement. James Newman, then President of Lantor, furnished Ellis with a document entitled “LUSA Sales Manager Incentive Plan.”[1] Although framed as a plan with general application, it applied only to Ellis, since he was Lantor USA’s only sales manager. This plan declared that a new bonus plan will apply from January 1, 1996, and set forth that new bonus scheme. It provided that, while Lantor would do everything possible to continue with incentive schemes at a fair and equitable level, “the Company reserves the right to change, alter or modify all bonus schemes." Ellis was plainly unhappy with the new bonus plan, so Newman sweetened the pot slightly, furnishing Ellis with a new plan dated March 13, 1996 that provided that, for 1996 only, if Lantor achieved an operating profit at a minimum of the 1995 level, payment would be not less than 31.5 percent of base salary. It also added two more new terms: that the employee must be employed on March 15 of the following year to be eligible to receive a bonus for the year that just ended, and that “[t]his plan supersedes any and all prior agreements whether written or verbal.” Ellis was unhappy with this new plan but he did not voice his objections to anyone at Lantor or immediately resign.
I do not find that Ellis accepted these terms of employment as a modification of his employment agreement; rather, they were imposed on him and he simply continued to work there, in part because he did not expect to stay at Lantor for a long time. While Newman attests that Ellis accepted these terms and appeared to be happy with them, I do not find this credible. The supposed guarantee was not truly a guarantee; it depended on Lantor’s operating profit and could be altered at any time by Lantor. Moreover, at most, it covered only one year; it would not apply beyond 1996. Most importantly, Ellis demonstrated by his negotiations in 1993 that he was both savvy with respect to employment agreements and fearful that Lantor’s promises were written in sand; he would not likely accept an agreement that gave Lantor the unfettered right to change all bonus schemes without his approval.
Ellis began to explore career options outside Lantor. On December 3, 1996, he wrote Stephen Schnabel, Lantor’s General Manager, proposing that Ellis form an independent sales agency that would offer a variety of materials to the wire and cable industry, and continue to sell Lantor’s products, but as an agent rather than an employee. Ellis wrote:
With the exception of the confidentiality requirements concerning Lantor, Inc. proprietary information, which will be fully honored, Lantor will agree to immediately release me from all obligations implied by my current employment agreement, including the non-compete agreement.
Ellis, however, abandoned the idea of becoming an independent sales agent after being offered a position by Neptco as its product manager in early January 1997. After accepting Neptco’s offer, Ellis wrote to Schnabel on January 8, 1997 and tendered his formal resignation from Lantor. In his letter, Ellis wrote that he would be willing to remain with Lantor for another two weeks to assist in the transition of customer accounts and outstanding business if Lantor agreed that it would pay his 1996 bonus in full on or before March 15, 1997 and confirmed in writing that the original terms of his employment agreement were nullified and that he was released from all its obligations except the confidentiality provision. He requested written agreement to these conditions by the close of business the next day — January 9.
An attorney for Lantor responded to Ellis’s request on January 9. As a result of that letter, Ellis consulted with an attorney and wrote a new resignation letter, dated January 10, 1997, declaring, “This letter is to formally notify Lantor Inc. that it is my intention not to renew the existing employment agreement and to terminate my employment from Lantor Inc. as soon as possible.” Schnabel wanted Ellis to reaffirm in writing *224 the non-compete agreement, but Ellis was unwilling to sign any further documents with Lantor. He later spoke with Gordon Donald, then a Managing Director of Lantor responsible for its North American operations. Donald told Ellis that he expected him to comply with the Non-Disclosure and Non-Compete Agreement, and to assist in a smooth transition. He indicated that, if Ellis agreed to that, he would support payment to Ellis of his 1996 bonus, which was in jeopardy since, according to the Sales Manager Incentive Plan, Ellis had to be employed at Lantor on March 15, 1997 to be eligible to receive it. As a result of his discussion with Donald, Ellis made a new proposal in a letter dated January 14, 1997, in which he offered to end his employment on February 9 but to “continue to protect Lantor’s interests for a period of three months after February 9 in any way that I can.” He also declared, “I would like to re-state that the non-compete agreement remains valid as written in the contract” and that “it is my understanding that the payment of the 1996 bonus is assured . . .”
Donald received the new proposal and telephoned Ellis to tell him that it seemed acceptable but he would need to have Schnabel, Ellis’s immediate supervisor, review and approve it. Donald wrote Schnabel, told him that Ellis’s proposal looked “workable” and asked him if there were “reasonable legal complications.” Schnabel wrote back on January 15 that Ellis’s proposal was acceptable. He recommended that Ellis be told that Lantor would execute a one-time separation agreement in accordance with his proposal paying him $23,111 on May 9, 1997, provided that Ellis agree to personal jurisdiction in Massachusetts regarding any disagreements and reaffirm the employment agreement and non-compete agreement. After receiving Schnabel’s memorandum, Donald wrote Ellis that same day that Lantor “can accept” his proposal and that Schnabel would “prepare the legalities,” which were not identified.
Schnabel, however, did not prepare the “legalities” until February 6, 1997, one day before Ellis was scheduled to terminate his employment.[2] He wrote Ellis a letter confirming that:
Ellis had entered into a Non-Disclosure and Non-Compete Agreement on September 8, 1992, and an employment agreement dated September 4, 1992;
the timing of the separation in that agreement was modified to February 7, 1997;
Lantor will make a one-time separation payment to Ellis of $23,111;
Lantor plans to enforce the terms and conditions of both the September 1992 agreements with Ellis;
Ellis will protect Lantor’s interests for three months following his separation; and
Ellis will provide a summary of past, current, and anticipated issues for each major customer.
Schnabel’s confirmation letter did not ask Ellis to sign it, nor reference an attached untitled agreement, nor state that Ellis’s execution of the attached agreement was a required condition of the Separation Agreement. The attached proposed agreement provided that:
Ellis held Lantor harmless from any future claims that may arise from Ellis’s employment and subsequent separation;
Massachusetts law would govern all disagreements;
all such disagreements would be resolved by final binding arbitration in Massachusetts, with each party splitting equally the cost of the arbitration and bearing its own costs and expenses, regardless of the outcome of the arbitration.
None of these terms had ever been discussed with Ellis; indeed, none had ever been discussed with Donald.
Ellis did not sign the attached agreement. He resigned on February 7 and fulfilled his obligations as set forth in Schnabel’s letter, but March 15 passed and he was not paid the promised bonus. He wrote Donald on March 21 asking about payment of the bonus. Donald by then was Chief Executive of Lantor’s Garment Accessories division, and no longer responsible for North American operations. He forwarded the letter to Schnabel, who appears to have done nothing with it, since Ellis wrote Donald again on April 10, declaring that he had kept his end of the bargain and asking whether Lantor was going to fulfil its obligation to pay him his 1996 bonus. Donald wrote back that same day, stating:
I believe that the payment is only waiting for a declaration from you concerning non-competition, as per our agreement. Are you going to sign? If so, I’ll accelerate the payment.
Ellis replied that same day, repeating his refusal to sign any further agreements with Lantor. He noted that nothing in their agreement made payment of his bonus contingent upon Ellis signing any declaration. On April 18, Ellis wrote Donald again, telling him that he has fulfilled his part of the agreement and asking him whether Lantor intended to fulfil its part and pay him his bonus. Donald, unhappy at still being involved in a matter outside his area of responsibility, wrote Schnabel on April 25, 1997 asking:
Considering that [Ellis] has said in his letter of [1/14/97]. .. that he agrees with the non-compete clause, why can we not conclude this issue? Are you talking to [Ellis]? Please deal with this?
Schnabel apparently still did not deal with it, because Ellis wrote Donald again on May 5, 1997 asking for a reply to his last letter. Donald passed this letter on to Schnabel, writing, “I presume that you are dealing with this.” Schnabel then telephoned Donald and told him that Ellis had refused to sign the requested documentation. Donald wrote Ellis later that same day *225 that his understanding was that the bonus would be paid as a severance payment in May and “I believe that you will reaffirm that you will not compete with Lantor.” Schnabel then caused Lantor’s Human Resources Manager to write Ellis a letter that day asking him to sign the February 6, 1997 agreement, now modified to provide for the confidentiality of the agreement, “[i]n order to prepare your separation check for disbursement.” Ellis continued to refuse to sign the agreement, and the bonus was never paid.
In early 1997, Neptco was a perimeter competitor of Lantor; its products included water blocking coatings, but it did not manufacture or market water blocking laminates. While Lantor was concerned about Ellis taking a job with Neptco, it did not contend that his acceptance of this employment constituted a violation of his non-compete agreement. Nonetheless, Lantor’s attorney -wrote Ellis a letter on April 8, 1997 regarding his contractual obligations to Lantor, and Ellis wrote back on April 14, assuring him that he was not aware that Neptco was developing the product— "water swellable cellulosic and synthetic laminates"— covered by the Non-Disclosure & Non-Compete Agreement. He also told Lantor’s attorney that he furnished Neptco a copy of that Agreement before he accepted employment with them.
On June 1, 1998, Neptco announced that it had signed an exclusive agreement with Freudenberg Nonwovens (“Freudenberg”), a direct competitor of Lantor in the manufacture and sale of water blocking laminates. Roughly two weeks before this announcement, on the evening of May 20, 1998, Schnabel happened to see Ellis at the bar of the 99 Restaurant in Foxborough with James Meaney, a chemical engineer then employed in Lantor’s research and development department. All that he could overhear was Meaney telling Ellis about Lantor’s purchase of traverse winding equipment. At the time of this meeting, Meaney had been working for months on the development of a laminate technology that could protect cables from sea water. The salt in sea water had retarded the absorbency of the water blocking laminates made by Lantor and its competitors, so a breakthrough to solve this problem would result in a major product advantage over the competition.
Schnabel’s discovery of this meeting, combined with rumors that Lantor had heard about Neptco’s anticipated agreement with Freudenberg, caused Lantor to commence an investigation of Ellis’s dealings with Meaney, including a review of Meaney’s e-mail correspondence. That review revealed that Ellis had written him on March 17, 1998 asking him how he was. Meaney replied on March 19 that he hoped Ellis would be in the Massachusetts area soon (Ellis resided in Georgia) because Meaney wanted to talk with him about “things.” Meaney said that Schnabel had lied to him for the last time and he was “ready to fly the coop.” That same day, Meaney e-mailed Doug Zuberer, who had replaced Ellis as Lantor’s Sales Manager, and told him that he was fed up with Lantor not paying him what he was worth and he would work for a company that would. He added, “Believe me Doug, there are companies that would appreciate my knowledge (if you know what I mean).” On March 19, at 1:00 p.m., Ellis e-mailed Meaney to tell him that he was in Rhode Island and could see him that evening if he were available. Meaney e-mailed back on March 23', saying he was sorry he had missed Ellis when he was in the area. Meaney wrote that others at Lantor were looking for employment and, if Neptco had any openings in its Quality Department, Ellis should let him know so he could let them know. Meaney added:
I enjoy product development, but I am reluctant to share my findings in the area of seawater swellable tapes with Lantor (among many other products). This is part of what I want to discuss with you.
Ellis wrote back on March 25 that he would be happy to help him or anyone else find a position in the wire and cable industry, where his contacts were. He then declared:
I very much want to talk with you about seawater polymers as well as other waterblocking issues, and the sooner the better. We could do it by telephone, but I would prefer to do it in person. If you want, I can make another trip up to R.I. (we are headquartered in Pawtucket) to meet with you.
Meaney wrote back on April 9 that he doubted he wanted full-time employment in a job relating to superabsorbents. He said, though, that he “would be more than happy to ‘consult’ with Neptco (via you) regarding seawater tapes (present and future) as well as any other topic of interest.” Meaney and Ellis did not meet in person, because of scheduling difficulties, until May 20.
Meaney had told Ellis that he had no non-compete agreement with Lantor, but that is because, as he told fellow employee Christopher Walsh, he had taken his original agreement from his personnel file. Meaney told Walsh that he was meeting with Ellis on May 20, and later told him what Ellis had told him at the meeting: that Neptco was going to join with Freudenberg to sell water blocking tapes, that a Lantor supplier had developed a seawater polymer but would not sell it to Lantor, and that Neptco had obtained a sample of one of Lantor’s water blocking tapes. He said nothing of what, if anything, Ellis had learned from Meaney.
Apart from what Schnabel overheard regarding the purchase of traverse winding equipment, there is no direct evidence that Meaney transmitted anything that could be considered confidential information to Ellis, since both Meaney and Ellis deny that any confidential information was discussed. Moreover, the information regarding the purchase of traverse winding equipment hardly constituted a trade secret. Lantor had pre *226 viously subcontracted its traverse winding operations but, by purchasing its own equipment, could now do this work in-house. It had already told some of its key corporate customers that it would be able to perform traverse winding better and more efficiently by doing this work itself, so the information relayed to Ellis was already known outside the company and would likely soon be known throughout the industry.
The circumstantial evidence shows that Meaney would have been receptive to providing confidential information, but that Ellis was not vigorous in eliciting it. Indeed, they did not meet together until nearly two months after Ellis’s e-mail in which he said that he wanted to discuss seawater polymers with Meaney; if he was eager to obtain confidential information, he could have tried harder to arrange a meeting. Moreover, if Ellis wanted to obtain detailed confidential information, the bar of the 99 Restaurant hardly seems the place to arrange to meet. In short, I find that, while both Ellis and Meaney were receptive to Meaney providing Ellis with proprietary information, little, if any, such information (and none constituting a trade secret) was transmitted at the May 20 meeting and there is no evidence of such information being transmitted at any other time.
CONCLUSIONS OF LAW
In determining whether to grant a preliminary injunction, this Court must perform the three-part balancing test articulated in Packaging Industries Group, Inc. v. Cheney, 380 Mass. 609, 616-17 (1980). First, the court must evaluate the moving party’s claim of injury and its likelihood of success on the merits. Id. at 617. Second, it must determine whether failing to issue a preliminary injunction would subject the moving party to irreparable injury — losses that cannot be repaired or adequately compensated upon final judgment. Id. at 617 & n. 11. Third, ”[i]f the judge is convinced that failure to issue the injunction would subject the moving parly to a substantial risk of irreparable harm, the judge must then balance this risk against any similar risk of irreparable harm which granting the injunction would create for the opposing parly.’’ Id. at 617. In balancing these factors, ”[w]hat matters as to each party is not the raw amount of irreparable harm the parly might conceivably suffer, but rather the risk of such harm in light of the party’s chance of success on the merits. Only where the balance between these risks cuts in favor of the moving parly may a preliminary injunction properly issue.” Id.
The defendants do not argue that the non-compete agreement is unenforceable because it is unreasonable in its time, space, or scope. See, e.g., All Stainless, Inc. v. Colby, 364 Mass. 773, 778 (1974). Rather, they contend that it should not be enforced and the preliminary injunction denied for two reasons. First, they contend that Lantor’s material breach of Ellis’s employment agreement, which incorporated by reference the Non-Disclosure & Non-Compete Agreement, and Lantor’s material breach of the 1997 Separation Agreement excuses Ellis from any obligation of non-competition. Second, they contend that, even if the Non-Disclosure & Non-Compete Agreement were still enforceable, it would not cover Ellis’s work with Neptco, because that Agreement forbids Ellis only from participating in a business that manufactures or markets “laminates” and Freudenberg does not manufacture or market “laminates.” As will become apparent, in view of my adoption of Ellis’s position regarding his first line of defense, I need not reach his second.
“It is well established that a material breach by one party excuses the other parly from further performance under the contract.” Ward v. American Mutual Liability Insurance Co., 15 Mass.App.Ct. 98, 100 (1983). It is also plain that a material breach of an employment agreement by an employer may discharge an employee from further obligation under a non-compete provision of that agreement. Id. at 101.
I find that Lantor committed a material breach of its employment agreement with Ellis in 1996 when it unilaterally changed the terms of employment by imposing a new bonus scheme and reserving the right to modify this and any future bonus scheme without limitation. I earlier found Ellis did not accept this plainly inferior incentive plan as a mutually agreeable modification of his employment agreement. Nor can there be any serious question that this unilateral change in the bonus scheme was material. In 1993, Lantor, through Van Gelder, wrote Ellis that the incentive program revised that year “is an ongoing and integral part of your employment agreement, which means that Lantor cannot suddenly decide that it will no longer be applicable in a certain year.” Less than three years later, Lantor did precisely that.
As a result of Lantor’s material breach of the employment agreement in 1996, Ellis was discharged from his obligations under that agreement, including his obligation not to compete with Lantor after leaving its employ. Ellis, following Lantor’s breach, did not say anything that reasonably manifested his waiver of this breach or his agreement to a modification of the agreement. Yet, he did continue in Lantor’s employ for nearly a year. The question is whether, by continuing his employment, he implicitly waived the breach or agreed to modify the agreement or otherwise ratified the modified agreement. I think not.
It is plain that an agreement may be modified orally even when the written agreement, as it does here, declares that it may only be modified in writing. See, e.g., Cambridgeport Savings Bank v. Boersner, 413 Mass. 432, 439 (1992). It is also plain that a party may ratify an agreement by intentionally accepting benefits under the agreement, or by acquiescing in the agreement for a period of time after he has had the opportunity to avoid it, or by affirmatively acknowledging its validity. See, e.g., Deren v. Digital Equipment Corp., 61 *227 F.3d 1, 2-3 (1st Cir. 1995); In re Boston Shipyard Corp., 886 F.2d 451, 455 (1st Cir. 1989).
Yet, when an employer, such as here, unilaterally breaches an employment agreement by reducing an employee’s compensation, the employee should not be understood to have waived that breach or agreed to a modified, less remunerative employment agreement simply because he does not quit his job. An employee may be employed with a written employment agreement or, like the vast majority of office and managerial employees in this country, without one. The latter are employed at-will, pursuant to the terms and conditions set by the employer, and their obligations are defined either by those terms and conditions or implied in law by the fiduciary duty owed by every employee to his employer. Therefore, when an employee returns to work following his employer’s breach of their written employment agreement, the employee may be accepting his salary, not through a modified formal employment agreement, but simply as an at-will employee working without a contract. I find that this is what Ellis did. Therefore, it is not reasonable to infer that Ellis’s decision to continue his employment manifested his waiver of the breach or his agreement to modify the agreement; it simply reflected his willingness to continue to work for a time and be paid what Lantor would pay him, without a formal contract. In the absence of evidence affirmatively reflecting that Ellis agreed to more, this is the fairest and most accurate characterization of what he did in the wake of Lantor’s breach. See Alexander & Alexander, Inc. v. Feldman, 913 F. Supp. 1495, 1502 (D.Kan. 1996); Forms Manufacturing, Inc. v. Edwards, 705 S.W.2d 67 (Mo. Ct. App. 1985).
This conclusion is reinforced by the observation that the contractual term Lantor chose to breach— the terms of Ellis’s bonus — had consequence only if Ellis chose to remain with Lantor until March 15, 1997 (one year beyond the time of the breach), because only then would he be entitled to receive a bonus for 1996. Ellis took affirmative steps to look for other work long before this and indeed terminated his employment with Lantor more than two months before this date. His conduct hardly reflected acquiescence in the new bonus scheme; if anything, it reflected the opposite.
The practical consequence of this doctrine is that employers, when they unilaterally breach an employment agreement by reducing an employee’s promised compensation, cannot assume that the employment agreement remains intact, as modified, and the employee’s duties under that agreement continue unaffected simply because the employee does not quit and is silent about his mistreatment. At the very least, an employer must obtain an affirmative manifestation that the employee agrees to waive the breach, or to modify the employment agreement, or otherwise commits himself to perform the obligations set forth in the employment agreement. Without such an affirmative manifestation, the. employee shall be deemed freed from the special obligations provided in his employment agreement, and shall be required only to comply with those obligations specifically identified by the employer or implied as a matter of law.
None of the cases cited by Lantor require a different position. In all of these ratification cases, the allegedly wronged party received benefits from the allegedly breaching party that were obtainable only under an identifiable contract, not through an at-will arrangement. See Deren v. Digital Equipment Corp., 61 F.3d at 1-3; In re Boston Shipyard Corp., 886 F.2d at 452-53; Vasapolli v. Rostoff, 39 F.3d 27 (1st Cir. 1994). For instance, in Deren, the employees who agreed to leave Digital’s employ received a severance in return for their separation, albeit less than they had earlier been promised. Deren, 61 F.3d at 2. The only fair characterization of what happened was that the departing employees accepted the alternate severance plan as consideration for their departure from Digital. Therefore, when they claimed their acceptance was made under duress, the court held that, having enjoyed the benefits of their severance for more than three years, they had ratified the alternate severance plan. Id. at 2-3. Here, the acceptance by Ellis of his salary following Lantor’s breach does not demonstrate that a written employment agreement survived the breach; it merely demonstrated that an employment relationship survived. By continuing his employment after the change in bonus scheme was imposed upon him, Ellis became an at-will employee, operating from that day forward without a written employment agreement. Lantor, by releasing itself of its obligation to comply with the bonus provisions it had promised in the employment agreement (as modified in 1993), released Ellis from his obligation to comply with the non-compete provisions in that agreement.
While Lantor says now that the employment agreement, with its incorporated Non-Disclosure & Non-Compete Agreement, remained in full force after the March 1996 modifications to the bonus scheme, it plainly had doubts about this position because it wanted very much for Ellis to confirm in writing that the Agreement remained in force at the time of his separation from Lantor in 1997. Ironically, if Lantor had paid Ellis his 1996 bonus, as it had promised, I would have found that the payment of that bonus was fair consideration for Ellis’s explicit agreement to become re-committed to the Non-Compete Agreement. Lantor, however, refused to pay that bonus. Regardless of whether I accept Lantor’s argument that there never was an executed Separation Agreement because Ellis refused to sign the ancillary agreement or Ellis’s argument that there was a binding Agreement that Lantor breached by failing to make good on the bonus payment, there can be no doubt that the Separation Agreement cannot provide an independent basis to *228 find that Ellis is now bound to a non-compete agreement that otherwise did not bind him.[3]
While Lantor no longer could enforce its written employment agreement with Ellis after its March 1996 breach of that agreement, this does not mean that it could not enforce the obligations implied by fact and law that Ellis continued to have as an at-will employee after that breach. Certainly, Ellis continued to have an obligation of good faith and fair dealing towards his employer, and the traditional fiduciary obligations owed to any employer. Blank v. Chelmsford Ob/Gyn, P.C., 420 Mass. 404, 407-08 (1995) (employment contract contains implied covenant of good faith and fair dealing). These obligations do not include an obligation not to compete with one’s employer following one’s employment, see generally All Stainless, Inc. v. Colby, 364 Mass. 773 (1974), but they do include an obligation not to reveal to third parties the trade secrets one obtained during the course of his employment. See Jet Spray Cooler, Inc. v. Crampton, 361 Mass. 835, 839 (1972). See also G.L.c. 93, §42 (whoever steals a trade secret shall be liable in tort to the owner of that trade secret).
G.L.c. 93, §42A provides:
In an action by an employer against a former employee under the provisions of this section for the conversion of a trade secret and where such conversion is in violation of the terms of a written employment agreement between said employer and employee, said employer shall, upon petition, be granted a preliminary injunction if it is shown that said employee is working in a directly competitive capacity with his former employer in violation of the terms of such agreement and that in violation of the terms of such agreement said employee has used such trade secret in such competition.
Since I have found that there was no enforceable written employment agreement between Lantor and Ellis at the time of Ellis’s separation, Lantor cannot meet the requirements of this statute. However, if I were to find that Ellis had used a Lantor trade secret in his work at Neptco, I would seriously consider whether injunctive relief was nonetheless appropriate to protect Lantor’s legitimate interest in protecting its trade secrets from disclosure to competitors. I do not find, based on the record before me, that Ellis has misappropriated or misused a Lantor trade secret. Nor do I find, based on the evidence regarding his discussions with Meaney, that he has induced other Lantor employees to breach their fiduciary duty by transmitting to him trade secrets or similar proprietary information, although this is a closer question. While I deny the plaintiff any preliminary injunctive relief, Ellis should recognize that he communicates at his peril with Lantor employees, especially those who are or were involved in research and development.
For the reasons stated above, I find that Lantor is not likely to prevail in this litigation, and that, on balance, the risk of irreparable injury to Ellis and Neptco from granting preliminary injunctive relief substantially exceeds the risk of irreparable injury to Lantor from the denial of its requested relief.
In view of this finding, I need not address the defendant’s second argument — that the scope of the Non-Disclosure & Non-Compete Agreement, which is limited to “laminates used for water blocking tapes,” does not cover Ellis’s employment with Neptco, since Freudenberg’s water blocking tapes are not “laminates.” This is a close, technical issue not easily decided by the examination of competing affidavits, and I am reluctant to decide it when it is not necessary to the disposition of this matter, especially since any such decision may have consequences for other Lantor employees who executed non-compete agreements with the same or similar language.
ORDER
For the reasons stated above, the plaintiffs motion for a preliminary injunction is DENIED and the extended temporary restraining order is hereby DISSOLVED.

LUSA was how Lantor referred to Lantor USA.

AIthough Ellis had said his employment would terminate on February 9, that was a Sunday: February 7 was a Friday.

I note, without deciding, that there is no dispute that Ellis, in reliance on Lantor’s promised payment of his 1996 bonus, fulfilled his promise to protect Lantor’s interests for three months following his separation and to provide Lantor with a summary of past, current, and anticipated issues with each major customer. Nor is there any dispute that Ellis first was told that Lantor might not pay him this bonus until after it was due to be paid on March 15, 1997. Consequently, even if Ellis’s refusal to sign the ancillary agreement meant that there was no enforceable Separation Agreement, he may be entitled to reliance or quantum meruit damages for the work he provided to Lantor following his separation.