# United States Court of Appeals
## For the First Circuit

No. 08-1456

WAGNER AND WAGNER AUTO SALES, INC.,

Plaintiff, Appellant,

v.

LAND ROVER NORTH AMERICA, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor IV, U.S. District Judge]

Before

Lynch, Chief Judge,
Selya and Lipez, Circuit Judges.

Stephen Gordon with whom Stephen Gordon & Associates was on brief for appellant.
John J. Sullivan with whom Carl J. Chiappa, Hogan & Hartson LLP, Jeffrey S. King, Gregory R. Youman, and Kirkpatrick & Lockhart Preston Gates Ellis LLP were on brief for appellee.

November 7, 2008

**LYNCH**, **Chief Judge**.  Plaintiff Wagner and Wagner Auto Sales, Inc. appeals from the district court's entry of summary judgment rejecting its claims against defendant Land Rover North America, Inc. under the Automobile Dealer's Day in Court Act, 15 U.S.C. § 1222 ("ADDCA"), and Mass. Gen. Laws ch. 93B, the Massachusetts "Dealer's Bill of Rights."  See generally Coady Corp. v. Toyota Motor Distribs., Inc., 361 F.3d 50, 54 (1st Cir. 2004). LRNA terminated a 2004 temporary dealership arrangement with Wagner, which led to this lawsuit.  The district court  wrote a thoughtful and meticulous opinion, Wagner & Wagner Auto Sales, Inc. v. Land Rover N. Am., Inc., 539 F. Supp. 2d 631 (D. Mass. 2008), which we affirm.

                              I.

        We describe the undisputed material facts on which entry of summary judgment was based.

        Wagner owned two luxury car dealerships in Massachusetts, which sold automobiles from manufacturers such as Mercedes-Benz, BMW, Audi, and Jaguar.  In 1999, Wagner wanted to expand to include Land Rovers and reached an agreement with LRNA to that effect. Three years later, on October 21, 2002, LRNA and Wagner entered into a Letter of Intent ("2002 LOI") that annulled and replaced the 1999 agreement.  Under the 2002 LOI, Wagner would construct a combined Land Rover/Jaguar dealership in Boylston, Massachusetts to be opened by March 31, 2004.  In November 2003, however, Wagner

                             -2-

requested to change the location of the proposed site for the dealership to Shrewsbury. LRNA approved this request because it believed Shrewsbury was the superior site.

The parties amended the 2002 LOI on June 14, 2004 and entered into a second Letter of Intent ("2004 LOI"), which stated that it incorporated any prior agreements and that its terms controlled in cases of conflict. The 2004 LOI is the contract at dispute in this case. Under the 2004 LOI, if Wagner met certain benchmarks it would receive a "Temporary Land Rover Dealer Agreement" ("TDA"), which would terminate if Wagner did not timely construct a new facility in Shrewsbury meeting particular requirements. If Wagner met the first deadline on August 31, 2004, Wagner would receive the TDA. Wagner did so and received the TDA, thus becoming a temporary Land Rover dealer at the Boylston location.

The 2004 LOI also established that the deadline for completion of construction of the permanent facility was February 28, 2006. It set interim deadlines for submission of plans, obtaining necessary regulatory approvals, and construction of the facility in Shrewsbury. The 2004 LOI also established a "planning volume" of 250 Land Rovers and 150 Jaguars. Paragraph 6 of the 2004 LOI stated: "Time is of the essence with respect to this schedule." The 2004 LOI provided a termination clause: that if Wagner failed "to meet any of the foregoing deadlines . . . this

Agreement and LOI shall, at Land Rover's option, expire and become null and void . . . . Any such failure shall also constitute a substantial and material breach [of the TDA] warranting the termination of [the TDA]."

Sometime after opening this temporary dealership in Boylston in September 2004, Wagner concluded that the proposed permanent dealership in Shrewsbury would not be financially viable under the specifications of the 2004 LOI. This was, in part, because LRNA had pulled one particular model -- the Freelander -- from the market. Moreover, Jaguar sales across the country had fallen precipitously since 2002, with new vehicle sales falling from 61,204 in 2002 to 20,683 in 2006.

Wagner did not meet the 2004 LOI's October 31, 2004 interim deadline for applying for all necessary regulatory approvals. Wagner also failed to meet the March 31, 2005 interim deadline for furnishing detailed construction drawings to LRNA or identifying a general contractor for the project.

On May 11, 2005, LRNA sent Wagner a letter advising that it had not met the March 31 deadline. Wagner requested an extension. On August 18, 2005, LRNA offered a twelve-month extension of the 2004 LOI deadlines "subject to [Wagner] signing amended agreements." On August 29, Wagner responded and requested an extension of up to three years and suggested that it was the Ford takeover of LRNA in 2000 that caused delays in construction of

-4-

the Land Rover/Jaguar dealership.  The letter also mentioned the national decline in Jaguar sales.

In response, on September 19, LRNA reiterated its prior offer of a one-year extension and stated that it would reconsider the size of the planning volume.  Wagner failed to respond in writing.  LRNA sent a final letter on February 22, 2006 saying that Wagner needed to contact Virginia Slocum, LRNA's liaison to the dealership, by February 28, 2006, or the agreement would be terminated effective May 1, 2006.

When the parties could not come to agreement regarding an extension of the contract, LRNA sent a Notice of Termination to Wagner on March 21, 2006, stating that the TDA would expire in ninety days.  The letter stated that the grounds for termination included Wagner's failure to comply with the agreed upon deadlines under the 2004 LOI.

Wagner brought suit in the district court contesting the validity of LRNA's termination under both Mass. Gen. Laws ch. 93B, § 3 and the ADDCA, seeking damages, injunctive relief, and costs.[1] After the district court granted summary judgment in favor of LRNA, Wagner timely appealed.

## II.

We review the district court's grant of summary judgment

---

[1]     On appeal, Wagner does not challenge the district court's decision with respect to the ADDCA.

de novo, drawing all reasonable inferences in favor of Wagner. Mellen v. Trs. of Boston Univ., 504 F.3d 21, 24 (1st Cir. 2007).

Chapter 93B of the Massachusetts General Laws regulates business practices among motor vehicle manufacturers, distributors, and dealers in Massachusetts.  Most recently amended in 2002, the chapter has two primary purposes.  The first "is to curb 'the potentially oppressive power of automobile manufacturers and distributors in relation to their affiliated dealers.'" Cadillac/Oldsmobile/Nissan Ctr., Inc. v. Gen. Motors Corp., 391 F.3d 304, 306 (1st Cir. 2004) (quoting Beard Motors, Inc. v. Toyota Motor Distribs., Inc., 480 N.E. 2d 303, 306 (Mass. 1985)).  The second "is to regulate competition in the retail automobile industry for the benefit of the public at large."  Id. (citing Am. Honda Motor Co. v. Bernardi's, Inc., 735 N.E.2d 348, 354 (Mass. 2000)).

Wagner claims that LRNA violated section 3 of the chapter in three ways.  First, Wagner argues that LRNA violated the chapter's requirement that terminations of dealerships be for good cause, largely because Wagner alleges that LRNA also breached the 2004 LOI.  Second, Wagner argues that LRNA violated section 3 by acting in bad faith in terminating the agreement.  Third, Wagner argues that LRNA failed to demonstrate good cause because it did not give Wagner an opportunity to cure.

Section 3 of chapter 93B makes "[u]nfair methods of

-6-

competition and unfair or deceptive acts or practices" unlawful. Mass. Gen. Laws ch. 93B, § 3. Among the enumerated "unfair methods" and "unfair or deceptive acts or practices," section 5 makes the termination of a motor vehicle franchise agreement unlawful under certain conditions. Id. § 5. Under section 5, "[i]t shall be a violation of subsection (a) of section 3 for a manufacturer, distributor or franchisor representative without good cause, in bad faith or in an arbitrary or unconscionable manner . . . to terminate the franchise agreement of a motor vehicle dealer . . . ."

In Coady Corporation, we held that "arbitrariness" under chapter 93B cannot be shown if the defendant's actions were based on "reasonable business practices." 361 F.3d at 56. It is only the egregious decision which can be labeled "arbitrary or unfair." The chapter was not intended to protect dealers from the normal risks of a free economy. Id.

A.   Good Cause Under Chapter 93B

The district court analyzed good cause under two different subsections of section 5. Section 5(h) provides:

> For purposes of this section, good cause may be found if the motor vehicle dealer failed to comply with or observe a provision of the franchise agreement that is material to the franchise relationship, including without limitation . . . facility requirements, which were communicated in writing to the motor vehicle dealer within a reasonable period before the effective date of the termination or nonrenewal, such that a reasonable opportunity to cure was afforded.

Mass. Gen. Laws ch. 93B, § 5(h). This section allows the court to make the good cause determination on the basis of a material breach concerning facility requirements alone. The district court assigned "heavy weight" to the breaches under section 5(h). Wagner & Wagner, 539 F. Supp. 2d at 470.

The district court also held that, alternatively, there was good cause for termination in considering the enumerated factors under section 5(j), which provides:

> In determining whether good cause has been established for terminating, refusing to extend or renew or changing or modifying the obligations of the motor vehicle dealer as a condition to offering a renewal, replacement or succeeding franchise agreement, the court shall consider all pertinent circumstances, that may include, but shall not be limited to: . . . the existence and materiality of any breaches, defaults or violations by the affected motor vehicle dealer of the terms or provisions of the existing franchise agreement or of applicable law.

Mass. Gen. Laws ch. 93B, § 5(j).[2]

_____

[2] The section lists six other factors: (1) the amount of business transacted by the affected motor vehicle dealer during the three-year period immediately preceding such notice as compared to the business available to it; (2) the investment necessarily made and obligations incurred by the affected motor vehicle dealer to perform its obligations under the existing franchise agreement; (3) the permanency of the investment of the affected motor vehicle dealer; (4) whether it is injurious or beneficial to the public welfare for the franchise agreement of the affected motor vehicle dealer to expire, to be modified, or to be terminated, or for the affected motor vehicle dealer to be replaced; (5) whether the affected motor vehicle dealer has adequate motor vehicle sales and service facilities, equipment, vehicle parts and qualified personnel to reasonably provide for the needs of the consumers for motor vehicles handled by the affected motor vehicle dealer; (6)

Under the terms of the chapter, the burden is on LRNA to establish good cause to terminate the franchise.  Id. § 5(m).  The district court correctly held that Wagner's "failure to meet the interim construction deadlines and the final facility completion deadlines" violated the terms of the 2004 LOI, and that Wagner's breach was material.  Wagner & Wagner, 539 F. Supp. 2d at 470.  On the undisputed facts, we agree that LRNA established good cause under both section 5(h) and section 5(j).  The court's finding is well-supported in the record.  The terms of the 2004 LOI and the TDA made it clear that completion of the Shrewsbury site dealership was a condition precedent to LRNA ultimately granting Wagner a non-temporary Land Rover Dealer Agreement.  Id.

Wagner never met any of the deadlines in the 2004 LOI after obtaining the TDA.  Ron Wagner, the owner of Wagner, conceded that the plaintiff never applied for any of the permits or regulatory approvals necessary to comply with the October 31, 2004 deadline.  He also conceded that Wagner failed to supply the required detailed construction drawings in compliance with the 2004 LOI's March 31, 2005 deadline.  He admitted that a general contractor was never identified or hired, and conceded that no site work ever even started.  That site work was required to be completed by September 30, 2005. Wagner thus failed to meet the September 30,

---

whether the affected motor vehicle dealer has been and is rendering adequate services to the public.  Mass. Gen. Laws ch. 93B, § 5(j).

2005 interim deadline and never opened the permanent facility by February 28, 2006, the completion date stated in the 2004 LOI.

On appeal, Wagner argues that its failure to perform is excused by what it alleges was LRNA's failure to approve in writing Wagner's preliminary construction plans and that it could not provide final detailed construction drawings until the preliminary drawings were approved by LRNA. LRNA's alleged failure to meet its obligations in turn prevented Wagner from performing by complying with the later deadlines of September 30, 2005 and February 28, 2006.

The argument fails. We bypass the question of whether Wagner preserved this argument in the district court. We are doubtful the issue was preserved because the facts offered by Wagner as disputed went to a different defense -- that regardless of the terms of the LOI there was a changed economic landscape of Land Rover and Jaguar sales warranting Wagner's non-compliance. See Boston Beer Co. v. Slesar Bros. Brewing Co., 9 F.3d 175, 180 (1st Cir. 1993)); Wright & Miller, Federal Practice & Procedure § 2716, at 282-86 (3d ed. 1998).

Even taking the argument that LRNA failed to approve the plans as preserved, there is no merit to it. The record shows that whatever Ron Wagner's initial uncertainty at deposition as to whether LRNA responded to Wagner's architectural drawings, Ron Wagner admitted that the drawings "did finally come back, but I

-10-

can't remember the dates." Upon further questioning, Ron Wagner admitted that the reason Wagner did not move ahead with applications for permits in compliance with the 2004 LOI was that he "lost focus," rather than because of LRNA's failure to approve the drawings. The record is clear that Wagner received the requisite approval of preliminary plans from LRNA. George Delaney, the LRNA representative who worked with Wagner, testified at his deposition, "[w]e approved the preliminary drawings, the size that they submitted." He further testified that after a meeting discussing the preliminary drawings and approving them "subject to the Wagners' architect making certain revisions," Delaney "advised the Wagners that they had met the first milestone under the LOI."

Wagner's argument that LRNA was in breach of its obligations depends on a misrepresentation of the record. Since Wagner was undeniably in breach of its contractual obligations, LRNA had good cause under sections 5(h) and 5(j).

B.   Bad Faith

Under chapter 93B, the burden of showing bad faith is on the dealer, Wagner. Mass. Gen. Laws ch. 93B, § 5(m). Plaintiff argues generally that LRNA showed bad faith[3] in terminating the

_____

[3]   Wagner contends that the Massachusetts covenant of good faith and fair dealing implied into contracts should define bad faith under chapter 93B. Plaintiff argues that, in light of Wagner's initial investment in the dealership, LRNA's alleged failure to approve the plans, the need for a reduced facility due to the decline in market conditions, and the evidence of ongoing negotiations between the parties, there was a breach of the implied

-11-

franchise agreement or that the question at least presents a triable issue of fact.

There is no evidence of bad faith and so no need to test whether there can ever be a finding of bad faith when good cause has been established under section 5(h). This court has explained that "[b]ad faith may encompass broader conduct under chapter 93B than mere coercion or intimidation." General GMC, Inc. v. Volvo White Truck Corp., 918 F.2d 306, 309 (1st Cir. 1990) (citing Tober Foreign Motors, Inc. v. Reiter Oldsmobile, Inc., 381 N.E.2d 908 (Mass. 1978)) (interpreting Mass. Gen. Laws ch. 93B, § 4(1), which then included language later amended and moved to § 5). Even so, plaintiff failed to present any evidence whatsoever of bad faith on the part of LRNA. LRNA simply enforced the terms of the 2004 LOI for which the parties had bargained. Although Wagner may have wished to change the terms of the 2004 LOI in light of changed market conditions, "chapter 93B was not meant to insulate dealers from the ordinary flux of pressure and striving that is part of a free economy." Coady Corp., 361 F.3d at 56.

C.    Opportunity to Cure

We turn to Wagner's argument that nonetheless it should prevail because LRNA failed to provide an opportunity to cure consistent with good cause as defined in chapter 93B. A court

---

covenant of good faith and fair dealing. The reference to a common law doctrine, however, adds nothing to Wagner's statutory claim.

examining whether there was good cause for termination may consider a number of different criteria, including whether the distributor gave the automobile dealer a reasonable opportunity to cure. The cure provision states that courts may find "good cause [for termination] . . . if the motor vehicle dealer failed to comply with [requirements that] . . . were communicated in writing to the motor vehicle dealer within a reasonable period before the effective date of the termination or nonrenewal, such that a <u>reasonable opportunity to cure was afforded</u>." Mass. Gen. Laws ch. 93B, § 5(h) (emphasis added). The district court correctly found on the undisputed facts that LRNA had repeatedly offered Wagner reasonable opportunity to cure.

When Wagner failed to meet its initial obligations, LRNA's Vice President of Franchise Operations sent a letter on May 16, 2005 asking Wagner why the March 31 deadline had not been met. LRNA's letter emphasized that time was of the essence and that material breaches would be enforced. Wagner responded, saying that the changed business outlook for Land Rover and Jaguar sales meant that it needed more time to adjust its business model, and Wagner's response, on July 13, 2005, requested an extension for an unspecified date. On August 18, 2005, LRNA responded to Wagner's request by offering (i) a one-year extension of the completion date and (ii) a reduction in the size of the facility subject to Wagner signing amended agreements. Wagner rejected LRNA's proposal and

-13-

instead sought an extension of up to three years. On those facts alone, Wagner's claim of inadequacy of an opportunity to cure fails.

LRNA rejected Wagner's counterproposal for a three-year extension on September 19, 2005 and restated its previous offer. The final letters in 2006, which granted LRNA more than sixty days notice until the effective termination date, put Wagner on notice of its contractual breach and gave Wagner repeated opportunity to cure by offering to amend the deadlines.

Indeed, the documents from the time show that Wagner never complained of a lack of an opportunity to cure. Rather it explained its failure to comply was due to adverse economic conditions, including the decline in Jaguar sales and the removal of the Freelander model from the market.

We note that Wagner was not an established Land Rover dealer of many years faced with the loss of a dealership, a core concern of the statute. See Autohaus, Inc. v. BMW of N. Am., Inc., No. CIV. A. 92-103403-MA, 1993 WL 1503945 (D. Mass. Dec. 23, 1993) (manufacturer had good cause in terminating twenty-five-year-old established dealership for failure to build facility as required in franchise agreement). Rather, Wagner was at the other end -- it was a temporary dealer. It was given a temporary initial dealership pursuant to the TDA and there were certain conditions precedent it had to meet to be given a more permanent dealership. It failed to meet those conditions.

-14-

D.   Oral Modification to the 2004 LOI

As a last resort, Wagner argues that its written contractual obligations were modified orally by agreement of the parties.  The district court correctly held there was no evidence of oral modification.  The plain language of the 2004 LOI forbids amending the agreement "in any manner except by an executed instrument in writing duly executed by an officer of the party to be charged."

Still, it is true that Massachusetts law allows claims of oral modification of written contracts contravening such contract language.  See Cambridgeport Savs. Bank v. Boersner, 597 N.E.2d 1017, 1022 (Mass. 1992) ("[A] provision that an agreement may not be amended orally but only by a written instrument does not necessarily bar oral modification of the contract.").  State law, however, imposes stringent proof requirements for such oral modification.  Massachusetts courts have made clear that "[t]he evidence of a subsequent oral modification must be of sufficient force to overcome the presumption that the integrated and complete agreement, which requires written consent to modification, expresses the intent of the parties."  Id. at 1022, n.10; see also Beal Bank S.S.B. v. Krock, No. 97-2241, 1998 WL 1085807, at *3 (1st Cir. 1998) ("Massachusetts . . . impose[s] a heavy burden on the party seeking to modify an integrated written contract by subsequent oral agreement.")

There is no evidence of any oral modification sufficient to overcome the presumption that the 2004 LOI expresses the intent of the parties. The evidence in the record shows that Wagner merely emphasized to the district court that negotiations were ongoing, without establishing the substance of the alleged oral modification.

### III.

Entry of summary judgment for LRNA is <u>affirmed</u>. Costs are awarded to LRNA.