Kirpalani, Maynard M., J.
The plaintiff, Protégé Software Services, Inc. (“Protégé”), commenced this *128 action against its former employee and his new employer, defendants Dennis Colameta (“Colameta”) and Monument Data Solutions LLC (“Monument”) (collectively, “defendants”), respectively, alleging, inter alia, that the defendants violated G.L.c. 93A and Colameta’s non-competition, non-solicitation, and non-disclosure provisions of his employment agreement with Protégé by misappropriating Protégé’s trade secrets, including customer lists, financial information, business plans and strategies, and by soliciting Protégé’s clients and customers. The defendants asserted a counterclaim against Protégé, contending that Protégé breached the employment agreement by decreasing Colameta’s compensation and by changing his job duties, thereby rendering the employment agreement and its provisions unenforceable. The action is before this court on the defendants’ motion for summary judgment and on Protégé’s cross motion for summary judgment. For the following reasons, the defendants’ motion is ALLOWED and Protégé’s motion is DENIED.
BACKGROUND
The following facts are undisputed and, where disputed, viewed in the light most favorable to the non-moving party. See Nelson v. Salem State Coll., 446 Mass. 525, 535 (2006).
Protégé provides software consulting and implementation support for the customers of the Oracle Corporation (“Oracle”) who purchase Oracle’s integrated business software and hardware. Approximately 80% of Protégé’s business is repeat business. Black Diamond Business Solutions LLC (“Black Diamond”), which Colameta founded in 2002, was also an Oracle consulting company. Black Diamond and Protégé entered into an Asset Purchase and Sale Agreement (“Asset P&S”) dated August 3, 2004. Pursuant to the Asset P&S, Protégé purchased for $1,475,000 Black Diamond’s customer contracts, “customer lists!,]” “rights to telephone numbers and directory listings and URL address!,]” and “goodwill and all rights to the use of the name” Black Diamond. Tab C to Protégé’s Motion.[2] Colameta received $811,250 from the sale. Also pursuant to the Asset P&S, Colameta and other Black Diamond employees entered into employment agreements with Protégé, effectively becoming Protégé employees.[3]
I. 2004 Employment Agreement
Colameta’s employment agreement with Protégé (“2004 Employment Agreement”) expressly reflected the requirement in the Asset P&S that Protégé and Colameta enter into an employment contract: “one of the terms of the [Asset P&S] requires that [Protégé] and [Colameta] mutually agree upon an Employment Contact [sic] to be effective upon the closing . . .’’ Exhibit A to Joint Appendix of Exhibits. The 2004 Employment Agreement listed Colameta’s title as Protégé’s Director of Customer Relations and described his primary duties as “[b]usiness development in existing accounts!,] client satisfaction!,] general over-site on projects!,] extending the full service offeringU and maintenance of positive relationships and customer base”[;] and his secondary duties as “[s]upport [of] sales cycles and teams (newbusiness)!,] and maintenance of] business partner relationships (to be assigned).” Exhibit A to Joint Appendix of Exhibits. The 2004 Employment Agreement also set his minimum salary at $200,000 per year, and provided for commissions, stock options, a yearly bonus, and fringe benefits. With respect to Colameta’s salary “for the initial year term of this Agreement,” the agreement provided that it “may be increased but not decreased upon an annual review by [Protégé].” Id.
The 2004 Employment Agreement provided four ways in which Colameta’s employment with Protégé could terminate: Colameta’s death; Colameta’s incapacity; Protégé’s termination of Colameta for “cause” which the agreement defined as, inter alia, Colameta’s criminal misconduct, incapacity resulting from drug or alcohol abuse, or violations of certain provisions of the 2004 Employment Agreement; and Colameta’s terminating his own employment for “good reason” which the agreement described as Protégé’s significantly changing Colameta’s duties under the agreement, reducing his compensation or benefits under the agreement, or otherwise failing to honor its obligations under the 2004 Employment Agreement, under the Asset P&S, or under “any ancillary document. . .” Id.
By its express terms, the 2004 Employment Agreement was effective for two years; the parties agreed that, at the end of the two-year term, Colameta would become “an employee at will.” Id. The 2004 Employment Agreement also expressly provided that, “[ejxcept as otherwise provided in this Agreement, the provisions of Paragraphs 6, 7, [and] 8 . . . shall continue in full force and effect notwithstanding the termination of [Colameta’s] employment with [Protégé] and/or the termination of this Agreement.” Id. Paragraph 6 is the “Confidential Information and Non-Disclosure” provision; paragraph 7 is the “Non-Competition” provision; and paragraph 8 is the “Return of Documents” provision.
Paragraph 6, the [‘Confidential Information and Non-Disclosure” provision of the 2004 Employment Agreement, prohibited Colameta “during or after the term of his employment hereunder” from disclosing Protégé’s “business and financial records, customer lists, proprietary knowledge or data, trade secrets and confidential methods of operations” to any party except in the course of his work for Protégé. Id. Under paragraph 7, the “Non-Competition” provision of the 2004 Employment Agreement, Colameta, for one year after his termination from Protégé, could not engage in the same business as Protégé, sell the same services as Protégé, solicit or accept business from any of Protégé’s customers or competitors, recruit any of *129 Protégé’s employees, or assist any party engaged in selling services similar to or in competition with Protégé’s services. Paragraph 8, the “Return of Documents” provision of the 2004 Employment Agreement, required Colameta, “(u)pon termination of his employment with [Protégé] for any reason,” to return “any originals and copies of any books, papers, customer or client contracts, customer lists, files, computer programs and data bases, books of account, notes and other documents and data or other writings, tapes or records of’ Protégé. Id.
II. 2007 Employment Agreement
To prevent Colameta from becoming an at-will employee, Protégé asked Colameta to execute a new employment agreement before the 2004 Employment Agreement expired.[4] Colameta negotiated this new employment agreement with Protégé’s then chief operating officer, Mary Mandarino (“Mandarino”) who drafted the new agreement, basing it on the 2004 Employment Agreement; Protégé’s president Michael Ivers (“Ivers”) and Colameta’s supervisor, Peter Lang (“Lang”) were also involved in the process. Colameta’s new agreement became effective on January 1, 2007 (“2007 Employment Agreement”), therefore he was an at-will employee between the September 2006 expiration of the 2004 Employment Agreement and the January 2007 effective date of the 2007 Employment Agreement.
The 2007 Employment Agreement named Colameta Protégé’s “Director of Sales — Oracle” and listed his duties as: “Build Protégé’s Presence within Oracle; Execution of Sales Cycles; Maintenance of Active Accounts; Support of Channel Marketing Events and Oracle Channel Management; [and] Assist with Building Protégé Competencies and Teams in both the Application and Fusion Middleware space.” Exhibit B to Joint Appendix of Exhibits. The 2007 Agreement also set forth his compensation. First, Colameta’s salary increased to $240,000 per year, effective September 2006. Second, Colameta was entitled to stock options. Finally, Colameta was eligible to earn commissions based on Protégé’s revenues,[5] with the potential to receive between $80,000 and $120,000 per year.[6] Protégé paid commissions
the month following the end of the calendar quarter, as follows: Q1 is payable in April; Q2 is payable in July[;] Q3 is payable in October!;] and Q4 is payable in January. All payments will be subject to applicable withholding and [Colameta] must be an active employee in good standing at the time each quarterly commission payment is paid. If [Colameta’s] employment is terminated by Protégé for any reason other than gross negligence, Protégé will pay [Colameta] [his] commission earned through [his] termination date.
Exhibit B to Joint Appendix of Exhibits.
This reworked commission plan, coupled with his increased salary “would result in a significant increase in [Colameta’s] overall net compensation from Protégé from what [he] earned under the 2004 [Employment] Agreement.” Exhibit I to Joint Appendix of Exhibits, par. 11. Colameta states in his August 2011 affidavit that ”[t]he additional overall compensation [he] would receive was the most significant factor [he] considered when deciding whether or not to enter into a new employment agreement with Protégéf,]” and that he would not have entered into the 2007 Employment Agreement “if [his] salary remained the same as it was under the 2004 [Employment] Agreement, or if [his] commission structure was not governed by the specific formula set forth under the 2007 [Employment] Agreement.” Id., pars. 13, 15.
The “Non-Competition” provisions of the 2007 Employment Agreement and the 2004 Employment Agreement are essentially the same, as are the “Return of Documents” provisions. The “Confidential Information and Non-Disclosure” provision of the 2007 Employment Agreement is shorter than that in the 2004 Employment Agreement. The provision omitted the requirement that Colameta disclose to Protégé any inventions, etc., he developed, and merely prohibited Colameta from disclosing to any parly, unless in connection with his work for Protégé, the “business and financial records, customer lists, proprietary knowledge or data, trade secrets and confidential methods of operations” of Protégé “or of entities with which [Protégé] was or expected to be affiliated [with] . . .” Exhibit B to Joint Appendix of Exhibits. Additionally, similar to the 2004 Employment Agreement, the 2007 Employment Agreement permitted Protégé to terminate Colameta for “cause” which the agreement defined as, inter alia, criminal misconduct, incapacity resulting from drug or alcohol abuse, or violation of certain provisions of the agreement; the agreement omitted the other three ways of termination included in the 2004 Employment Agreement.
The 2007 Employment Agreement was the final employment agreement with Protégé that Colameta executed.
III. Protégé’s Financial Difficulties and Colameta’s Resignation
The nation’s economic downturn in September and October 2008 was the primary cause of the financial difficulties that Protégé began to experience. As a result of these financial difficulties, Colameta, on Protégé’s behalf, laid off about one-third of Protégé’s workforce, between fifteen and seventeen employees, in January 2009. Also in January 2009, Protégé removed its commission plan for all of its employees,[7] and informed Colameta that it was cutting his salary by $40,000 per year.[8] Additionally, Mandarino’s yearly salary dropped from over $200,000 to $150,000, and Lang’s yearly salary dropped from $250,000 to $200,000; as Ivers and Chiappini had already reduced *130 their yearly salaries in 2008 to $38,000, Protégé did not reduce their salaries further. Protégé’s difficulties continued through the first two and a half months of 2009 with the failure of Cambridge Technology Enterprises Limited’s (“CTE”) plan to acquire Protégé[9] and the concomitant drop in Protégé stock;[10] additionally, one of Protégé’s founders, Edward Chiappini (“Chiappini”) intended to leave the company.
In summer 2008, in anticipation of CTE’s expected acquisition of Protégé, Protégé altered its management structure, changing Colameta’s duties to management of the consultants;[11] according to Colameta, as “director of consulting,” he was no longer responsible for directing new sales business or managing customer relationships, although there was a period of transition during which he turned over those accounts to Lang. Tab Q to Protégé’s Motion, at 43-46. In January 2009, once the acquisition did not go through, Protégé maintained the altered structure, and also gave Colameta the additional responsibility of handling the recruiting process; at this point, according to Colameta, his title became “director of consulting and corporate recruiting.” Tab Q to Protégé’s Motion, at 45-48.
By exploring other job opportunities,[12] Colameta learned that there was a position available at Monument, an Oracle consulting company, like Protégé, and a Protégé competitor. Colameta and Monument’s owner, Carl Rubin (“Rubin”), discussed the 2007 Employment Agreement and agreed that Colameta could leave Protégé without breaching the agreement because Protégé had breached it first by reducing Colameta’s salary and eliminating commissions.
Colameta resigned from Protégé in a letter dated March 5, 2009. Ivers and Chiappini met with Colameta in an attempt to convince Colameta to reconsider, but Colameta informed them that he was unhappy with his salary reduction. During this meeting, the parties did not refer to the 2007 Employment Agreement. Colameta’s final day at Protégé was March 17, 2009. Upon leaving Protégé, Colameta returned his laptop “stripped of information . . .” Tab Q to Protégé’s Motion, at 85.[13]
On March 18, 2009, Ivers contacted the six customers with which Protégé had active business opportunities to inform them of Colameta’s departure; the customers told Ivers that they already knew.[14]
In late March or early April 2009,[15] Colameta began working at Monument as its president. Colameta’s yearly salary at Monument was $200,000; he received no commissions or stock options and had no ownership interest in Monument. While at Monument, Colameta contacted Avidyne, Beckman Coulter, DeLorme, Massachusetts Biologic Laboratories, The Mentor Network, The Siemon Company (located in Connecticut), and TransAct Technologies, and submitted proposals for business to AS&E, DeLorme, Cidra, Massachusetts Biologic Laboratories, and The Mentor Network.[16], [17] After Colameta began working at Monument, Monument entered into contracts for services with AS&E, Ariad, Beckman Coulter, Candela, DeLorme, Hope Global,[18] Massachusetts Biologic Laboratories, The Mentor Network, PTC, SunLife, and TransAct Technologies.[19]
At the time Colameta left Protégé, he was aware of Protégé’s outstanding proposals and business opportunities. While at Protégé, Colameta had a business relationship with Massachusetts Biologic Laboratories; when he left Protégé, Colameta took a couple of proposals that he worked on, including Massachusetts Biologic Laboratories proposals;[20] while at Monument, Colameta sold and obtained Massachusetts Biologic Laboratories work. Ivers testified at his deposition that, before Colameta left, Protégé had a proposal out to TransAct Technologies, but after Colameta left, TransAct Technologies refused to answer Protégé’s calls. Tab A (part 3) to Protégé’s Motion, at 229-30. He further testified that “[p]ieces of business that were in [Protégé’s] pipeline after a trade show that Monument wasn’t at . . . magically appeared as Monument customers” on the list Monument provided as part of discoveiy in this case. Tab P to Protégé’s Motion, at 231. Protégé, however, is unaware of any company, with which it had a contractual agreement at the time that Colameta left, that broke its contract with Protégé.
Since Colameta’s departure, Protégé employees have received commissions and bonuses because of Protégé’s improved profitability. Ivers’s salary increased from $38,000 in 2009 to $200,000 in 2010; at his deposition, he estimated that his salary for 2011 would be $350,000.
DISCUSSION
Summary judgment is granted where there are no genuine issues of material fact and where the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Commissioner of Corr., 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating that there is no triable issue, and that the summary judgment record entitles the moving party to judgment as a matter of law. Flesner v. Technical Commc’ns Corp., 410 Mass. 805, 808-09 (1991); Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989); see Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). As the moving party has this burden, the court considers the evidence presented in the light most favorable to the non-moving party. Mass.R.Civ.P. 56(c); Augat, Inc. v. Liberty Mut. Ins. Co., 410 Mass. 117, 120 (1991); Parent v. Stone & Webster Eng'g Corp., 408 Mass. 108, 113 (1990); Flynn v. Boston, 59 Mass.App.Ct. 490, 491 (2003). The opposing party cannot rest on his or her pleadings and mere assertions of disputed facts to defeat the motion for summary judgment. LaLonde v. Eiss *131 ner, 405 Mass. 207, 209 (1989). “(B)are assertions and conclusions . . . are not enough to withstand a well-pleaded motion for summary judgment.” Polaroid Corp. v. Rollins Envtl. Servs., Inc., 416 Mass. 684, 696 (1993).
The defendants and Protégé seek summary judgment on Protégé’s claims alleging breach of the 2007 Employment Agreement (Count V), breach of the non-competition and non-solicitation provisions of that agreement (Count I) and of the non-disclosure provision of that agreement (Count II); intentional interference with the 2007 Employment Agreement (Count IV) and with Protégé’s advantageous business relationships (Count III); and violation of G.L.c. 93A. Protégé also seeks summary judgment on its claim of misappropriation of trade secrets (Count VIII), and the defendants seek summary judgment on their counterclaim alleging that Protégé breached the 2007 Employment Agreement.
I. 2007 Employment Agreement
The defendants answered Protégé’s allegations that they breached the 2007 Employment Agreement with the counterclaim that Protégé breached the 2007 Employment Agreement first by reducing his salary and changing his job responsibilities, thereby excusing Colameta from thereafter complying with that agreement. Protégé asserts that it did not breach the 2007 Employment Agreement because it had the right to make changes.
A. Authority to Change 2007 Employment Agreement
Protégé bases its argument that it had the right to change Colameta’s compensation scheme and job duties on the doctrine of expressio unius est ex-clusio alterius, i.e., “expression of one thing is the exclusion of another.” Black’s Law Dictionary, 1635 (7th ed. 1999); see Laurin v. Providence Hosp., 150 F.3d 52, 60 (1st Cir. 1998) (“[T]he doctrine of ex-pressio unius est exclusio alterius instructs that when certain matters are mentioned in a contract, other similar matters not mentioned were intended to be excluded” (citation and internal quotes omitted)). Specifically, it points out that the 2004 Employment Agreement permitted Protégé to terminate Colameta “for cause” and permitted Colameta to terminate his employment “for good reason,” with good reason being Protégé’s assigning to Colameta “duties significantly different from those contemplated by this Agreement,” or reducing Colameta’s “compensation or benefits to which [he] is entitled under this [Agreement, or otherwise failing to honor its obligations under this Agreement ...” The 2004 Employment Agreement also guaranteed Colameta a salary of $200,000 for his first year with Protégé, providing that the amount could be “increased but not decreased upon an annual review by” Protégé. Conversely, the 2007 Employment Agreement still permitted Protégé to terminate Colameta “for cause,” but it did not contain a provision permitting Colameta to terminate his employmentforgoodreason or a provision guaranteeing Colameta’s salary.[21] The absence of these provisions, Protégé argues, means that Protégé had the authority to make unilateral changes to the 2007 Employment Agreement without being in breach.
In interpreting a contract, the court “must first examine the language of the contract by itself, independent of extrinsic evidence concerning the drafting history or the intention of the parties.” Indus Partners, LLC v. Intelligroup, Inc., 77 Mass.App.Ct. 793, 795 (2010), quoting Bank v. Thermo Elemental, Inc., 451 Mass. 638, 648 (2008). The court only considers extrinsic evidence “in the construction of ambiguous contract language.” Id. (citation omitted); see id. (holding that ambiguity “is not created simply because a controversy exists between parties, each favoring an interpretation contrary to the other’s” (citation omitted)). Where the contract language is unambiguous, the court does “not look beyond the four corners of the contract.” Id. at 796.
By implicating the maxim expressio unius est exclusio alterius, Protégé asks this court to look beyond the four corners of the 2007 Employment Agreement to the terms of the 2004 Employment Agreement[22] and to conclude that the exclusion of a provision prohibiting Protégé from reducing Colameta’s salary or changing his job duties gave Protégé the authority to do both. The 2007 Employment Agreement, however, is unambiguous; indeed, neither Protégé nor the defendants argue to the contrary. The court therefore cannot use the 2004 Employment Agreement to assist in the interpretation of the 2007 Employment Agreement, whether through application of the maxim of expressio unius est exclusio alterius or otherwise. See McAdams v. Massachusetts Mut. Life Ins. Co., 391 F.3d 287, 300 (1st Cir. 2004) (holding that “principle of expressio unius est exclusio alterius has no place” in interpretation of unambiguous contract).
B. Protégé’s Breach of the 2007 Employment Agreement
Protégé asserts that Colameta breached the 2007 Employment Agreement, but the defendants argue that Protégé’s own breach discharged Colameta from his obligations under that agreement. An employer’s unilateral alteration of an employment agreement can constitute a breach of that agreement. See, e.g., F.A. Bartlett Tree Expert Co. v. Barrington, 353 Mass. 585, 587 (1968); Ward v. American Mut. Liab. Ins. Co., 15 Mass.App.Ct. 98, 101 (1983); Grace Hunt IT Solutions, LLC v. SIS Software, LLC, Civil No. 2012-00080, 2012 WL 1088825, *4 [29 Mass. L. Rptr. 460] (Suffolk Super. Ct. Feb. 14, 2012) (Lauriat, J.); Lantor Inc. v. Ellis, Civil No. 98-01064, 1998 WL 726502, **9-10 [9 Mass. L. Rptr. 221] (Norfolk Super. Ct. Oct. 2, 1998) *132 (Gants, J.). “It is well settled that a material breach of contract by one party excuses the other party from performance as matter of law.. .” HRPT Advisers, Inc. v. MacDonald, Levine, Jenkins & Co., P.C., 43 Mass.App.Ct. 613, 626 n.16 (1997), citing Hastings Assocs., Inc. v. Local 369 Bldg. Fund, Inc., 42 Mass.App.Ct. 162, 171 (1997). Therefore, the question of Colameta’s conduct only becomes relevant if the court determines as a matter of law that Protégé’s conduct did not constitute a material breach of the 2007 Employment Agreement that discharged Colameta’s obligations under that agreement. See, e.g., Ward, 15 Mass.App.Ct. at 101 (holding that employer’s “wrongful discharges of the plaintiffs constituted breaches of the employment agreements so material as to discharge the plaintiffs from any further obligations under the contracts [i.e., covenants not to compete] and to allow them to recover contract damages for total breach”).
A breach is material if it is “of ‘an essential and inducing feature of the contract!,]’ ” Lease-It, Inc. v. Massachusetts Port Auth., 33 Mass.App.Ct. 391, 397 (1992), quoting Bucholz v. Green Bros. Co., 272 Mass. 49, 52 (1930), and if it is “a substantial breach going to the root of the contract.” Prozinski v. Northeast Real Estate Servs., LLC, 59 Mass.App.Ct. 599, 610 (2003); Ward, 15 Mass.App.Ct. at 101. “Whether a breach is material or immaterial normally is a question for the jury to decide.” Prozinski, 59 Mass.App.Ct. at 609, quoting Lease-It, Inc., 33 Mass.App.Ct. at 396; Hastings Assocs., Inc., 42 Mass.App.Ct. at 171 (“Whether there is such a material breach is a question for the juiy’j; see Restatement (Second) of Contracts §241 (1981) (setting forth circumstances to consider “[i]n determining whether a failure to render or to offer performance is material”). The undisputed facts in the summary judgment record, however, permit the court to resolve this matter.
It is undisputed that between summer 2008 and January 2009, Protégé made changes to Colameta’s employment as described in the 2007 Employment Agreement. First, Protégé assigned Colameta to manage a group of consultants and took away his sales responsibilities, changing his title from “Director of Sales — Oracle” to “director of consulting.” Second, Protégé tasked Colameta with handling the recruiting process and changed Colameta’s title again to “director of consulting and corporate recruiting.” Third, Protégé reduced Colameta’s annual salary by $40,000. Finally, Protégé eliminated the commission program, and gave Colameta the responsibility of developing a new commission program. In determining whether these actions constitute material breaches of the 2007 Employment Agreement, this court finds persuasive the reasoning this court (Gants, J.) employed in Lantor Inc., 1998 WL 726502, at **9-10.
Similar to this case, the plaintiff-employer in Lantor Inc. sued its former employee and his current employer, alleging that they violated the non-disclosure and non-compete agreement between the plaintiff and its former employee; the defendant former employee counterclaimed against the plaintiff, alleging that the plaintiffs breach of the employment agreement discharged the defendant’s obligation under that agreement. Id. at *1. The defendant had negotiated that employment agreement while he was working for the plaintiff, and it had included a yearly salary of $65,000, a “Sales Incentive Program” that placed “no cap on his earning potential,” and an “Objectives Program that would permit him to earn up to 15 percent of his base salary if he met four quantifiable objectives, plus other benefits.” Id. The employment agreement also included non-compete, non-disclosure, and non-solicitation provisions that placed restrictions on the defendant’s conduct for two years after his termination of employment. Id. at *2.
Less than a year after executing this agreement, the plaintiff informed the defendant “that the Sales Incentive Program . . . had to be changed to include a cap ...” Id. The parties commenced renegotiations of the employment agreement, with the defendant ultimately accepting that change. Id. During these negotiations, in response to the defendant’s question, “what is there to prevent [the plaintiff] from deciding to change the compensation plan, or any other portion of the employment agreement, again at a later date?” the plaintiff wrote, “The incentive program is an ongoing and integral part of [the defendant’s] employment agreement, which means that [the plaintiff] cannot suddenly decide that it will not longer be applicable in a certain year.” Id. at *3. Over two years later, in 1996, the plaintiff unilaterally changed the incentive program again “by imposing a new bonus scheme and reserving the right to modify this and any future bonus scheme without limitation.” Id. at *3, *9. The court found that the defendant did not accept “these terms of employment as a modification of his employment agreement; rather, they were imposed on him and he simply continued to work there, in part because he did not expect to stay at [the plaintiff] for a long time.” Id. at *3. Indeed, the defendant began to explore other career options and, approximately one year later, accepted a position at another company. Id. at **3-4.
The court held that the plaintiff committed a material breach of its employment agreement “in 1996 when it unilaterally changed the terms of employment” by imposing a new compensation scheme. Id. at *9. The defendant “did not accept this plainly inferior incentive plan as a mutually agreeable modification of his employment agreement. Nor can there be any serious question that this unilateral change in the bonus scheme was material” given the plaintiffs earlier assurance that the incentive *133 program was “an ongoing and integral part of [his] employment agreement” that the plaintiff could not decide to change. Id.
The court further held that, “when an employer ... unilaterally breaches an employment agreement by reducing an employee’s compensation, the employee should not be understood to have waived the breach or agreed to a modified, less remunerative employment agreement simply because he does not quit his job.” Id. “[W]hen a employee returns to work following his employer’s breach of their written employment agreement, an employee may be accepting his salary, not through a modified formal employment agreement, but simply as an at-will employee working without a contract.” Id. Thus, the defendant’s decision to continue his employment “simply reflected his willingness to continue to work for a time and be paid what [the plaintiff] would pay him, without a formal contract.” Id.; see id. at *10 (“[T]he acceptance by [defendant] of his salary following [the plaintiffs] breach does not demonstrate that a written employment agreement survived the breach; it merely demonstrated than an employment relationship survived”). In fact, given that the plaintiff “took affirmative steps to look for other work long before . . . [the time he would have received his bonus] and indeed terminated his employment with [the plaintiff] more than two months before this date[,] [h]is conduct hardly reflected acquiescence in the new bonus scheme; if anything, it reflected the opposite.” Id. at *10.
Although in this case, the parties did not express in writing that Colameta’s salary and commissions were an integral part of the 2007 Employment Agreement, and although Colameta began to search for another job before Protégé changed his duties or reduced his compensation, Colameta attests — without contradiction from Protégé — to the importance of the increase in his compensation in remaining with Protégé after the expiration of his 2004 Employment Agreement, and he only left Protégé after his salary was reduced and his job duties underwent their second alteration, resulting in Colameta’s having more responsibilities for less pay. Viewing Protégé’s actions together, it was in breach of the 2007 Employment Agreement, at the latest, by January 2009, when it reduced Colameta’s salary by $40,000, eliminated Colameta’s commission plan, and had twice effected changes to Colameta’s job duties.[23] See, e.g., F.A. Bartlett Tree Expert Co., 353 Mass. at 587 (holding that change in employee’s “rate of compensation and sales area” constituted “far reaching changes [that] strongly suggest[edl that the parties had abandoned their old arrangement and had entered into a new relationship”); Grace Hunt IT Solutions, LLC, 2012 WL 1088825, at *4 (finding material change in employment relationship voided employment agreement where employer’s “change in [employees’] compensation plan was ... significant!,]” i.e., “their base salary was cut by 20%”). As a consequence, by January 2009, Colameta was an at-will employee and no longer subject to the provisions of the 2007 Employment Agreement. Augat, Inc. v. Aegis, Inc., 409 Mass. 165, 172 (1991) (“An at-will employee may properly plan to go into competition with his employer and may take active steps to do so while still employed . . . Such an employee has no general duty to disclose his plans to his employer, and generally he may secretly join other employees in the endeavor without violating any duty to his employer”).
Accordingly the defendants’ motion for summary judgment is ALLOWED as to their counterclaim for breach of contract against Protégé; and their motion is ALLOWED and Protégé’s motion is DENIED as to Counts I, II, IV, and v. of Protégé’s Verified Complaint.[24]
II. Intentional Interference with Advantageous Business Relationships
Separate from its contract claims, Protégé also alleges that Monument intentionally interfered with Protégé’s advantageous business relationships with its clients and customers by soliciting their business and taking other actions in violation of the 2007 Employment Agreement (Count III). See, e.g., Lantor Inc., 1998 WL 726502, at *11 (“While [the plaintiff] no longer could enforce its written employment agreement with [the defendant] after its . . . breach of that agreement, this does not mean that it could not enforce the obligations implied by fact and law that [the defendant] continued to have as an at-will employee after that breach”). “In order to make out a claim for interference with advantageous business relations, the plaintiff must prove that (1) he had a business relationship for economic benefit with a third party, (2) the defendants knew of the relationship, (3) the defendants interfered with the relationship through improper motive or means, and (4) the plaintiffs loss of advantage resulted directly from the defendants’ conduct.” Cavicchi v. Koski, 67 Mass.App.Ct. 654, 657 (2006), quoting Kurker v. Hill, 44 Mass.App.Ct. 184, 191 (1998); see Blackstone v. Cashman, 448 Mass. 255, 260 (2007) (defining advantageous relationship with third party as “present or prospective contract”).
This claim does not survive the defendants’ motion for summary judgment because, even if the court assumes Protégé can satisfy the first, second, and fourth elements of this claim, it cannot establish that Monument interfered with its business relationships through improper motive or means. “The improper conduct ‘may include ulterior motive (e.g., wishing to do injury) or wrongful means (e.g., deceit or economic coercion),’ ” and “[ijmproper means include violation of a statute or common-law precept, e.g., by means of threats, misrepresentation, or defamation ... As to improper motive, evi *134 dence of retaliation or ill will toward the plaintiff will supporttheclaim.” Cavicchi, 67 Mass.App.Ct. at 658 (internal citations omitted). Here, the improper means that Protégé alleges Monument used is the violation of the 2007 Employment Agreement. That means is improper, however, only if the non-competition and non-solicitation provisions of the 2007 Employment Agreement were enforceable. See, e.g., Curtis v. Herb Chambers I-95, Inc., 458 Mass. 674, 681 (2011) (“The only improper means alleged is the reproduction of [the plaintiffs] design, which is improper only if [the plaintiff] had a legal right or entitlement equivalent to copyright”).
As concluded above, Protégé’s material breach of the 2007 Employment Agreement discharged Colameta from complying with that agreement. The defendants have accordingly established that Protégé will be unable to prove the third element of this claim at trial. Therefore, the defendants’ motion for summary judgment as to Count III is ALLOWED and Protégé’s motion is DENIED.
III. Misappropriation of Trade Secrets[25]
Protégé has moved for summary judgment on its allegation that the defendants misappropriated trade secrets (Count VIII), correctly pointing out that this claim is “actionable independent of [Colameta’s] contractual obligations” under the non-compete and non-disclosure provisions of the 2007 Employment Agreement. Specialized Tech. Res., Inc. v. JPS Elastomerics Corp., 80 Mass.App.Ct. 841, 847 (2011); see Eastern Marble Prods. Corp. v. Roman Marble, Inc., 372 Mass. 835, 841 (1977) (“It is settled by our cases that the duty of an employee not to disclose confidential information is grounded on ’ “basic principles of equity” . . . and upon an implied contract, growing out of the nature of the employer-employee relation’ ” (ellipses in original) (quoting Jet Spray Cooler, Inc. v. Crampton, 361 Mass. 835, 839 (1972))). “To prevail on a claim of misappropriation of trade secrets, a plaintiff must show: 1) the information is a trade secret; 2) the plaintiff took reasonable steps to preserve the secrecy of the information; and 3) the defendant used improper means, in breach of a confidential relationship, to acquire and use the trade secret.” Incase, Inc. v. Timex Corp., 488 F.3d 46, 52 (1st Cir. 2007); see J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc., 357 Mass. 728, 736-39 (1970).
Although Protégé has not demonstrated that it is entitled to judgment as a matter of law on this claim, the defendants, in opposing Protégé’s motion for summary judgment, have not demonstrated that Protégé will be unable to prove at trial that it took reasonable steps to preserve the secrecy of certain information, or that Colameta violated his duty not to disclose his former employer’s confidential information. There is also a genuine issue of material fact as to whether the purportedly misappropriated information is a trade secret. See Warner-Lambert Co. v. Execuquest Corp., 427 Mass. 46, 49 & n.5 (1998) (setting forth “six factors of relevant factual inquiry to determine whether ‘information sought to be protected is, in fact and in law, confidential’ ”); Augat, Inc., 409 Mass. at 169-70; Eastern Marble Prods. Corp., 372 Mass. at 839 (“What is a trade secret depends in each case ‘on the conduct of the parties and the nature of the information’ ”); Jet Spray Cooler, Inc., 361 Mass. at 840.
The trade secrets that Protégé alleges the defendants misappropriated Eire Protégé’s customer lists, financial information, pricing information, and business plans and strategies. The summary judgment record indicates that Protégé had had business relationships with Beckman Coulter, DeLorme, The Mentor Network, The Siemon Company, Hope Global, TransAct Technologies, and Massachusetts Biologic Laboratories, all of which Colameta contacted and/or entered into contracts with while at Monument. Although the defendants dispute that Protégé had active contracts or billing relationships with these entities at that time, and although Protégé admits that it is unaware of any company that broke its contract with Protégé after Colameta left, the summary judgment record, even viewed in the light most favorable to the defendants, permits the inference that, while working at Monument, Colameta used customer information that he took from Protégé. Additionally, Colameta admits to having taken at least two Protégé proposals with him to Monument.
This type of information may constitute trade secrets. See G.L.c. 266, §30 (defining “trade secret” as used in G.L.c. 93, §42, as including “anything tangible or intangible or electronically kept or stored, which constitutes, represents, evidences or records a secret scientific, technical, merchandising, production or management information, design, process, procedure, formula, invention or improvement”); Warner-Lambert Co., 427 Mass. at 49 (“ [Confidential and proprietary business information may be entitled to protection, even if such information cannot claim trade secret protection”); see, e.g., Augat, Inc., 409 Mass. at 173 (holding that included among trade secrets employee may not appropriate from employer is “certain information, such as lists of customers”). “Matters of public knowledge or of general knowledge in an industry!, however,] cannot be appropriated by one as his secret.” J.T. Healy & Son, Inc., 357 Mass. at 736. With Colameta’s deposition testimony, the defendants have raised an issue as to whether the information Colameta allegedly appropriated when he left Protégé was generally known in the industry.
Protégé’s motion for summary judgment on this count is therefore DENIED.
*135 IV. G.L.c. 93A, §11
Protégé has asserted this claim against Monument (Count VII), alleging that Monument was aware of the 2007 Employment Agreement, and that, by hiring and employing Colameta, Monument engaged in unfair and deceptive acts because it permitted Colameta to violate that agreement by selling products similar to or in competition with Protégé’s products and by soliciting former Protégé customers. By its terms, then, the premise of this claim is that Colameta’s conduct upon leaving Protégé violated the 2007 Employment Agreement. As discussed above, however, Protégé’s material breach of the 2007 Employment Agreement discharged Colameta from complying with the non-compete, non-disclosure, and non-solicitation provisions of that agreement. As Colameta did not violate the 2007 Employment Agreement, Monument did not act in violation of G.L.c. 93A, §11, by hiring and employing Colameta. The defendants’ motion for summary judgment is accordingly ALLOWED on this basis.
Count VII does incorporate by reference all of the paragraphs that appear before it, including Count III in which Protégé alleges that Monument intentionally interfered with Protégé’s advantageous business relationships by soliciting the business of Protégé’s clients and customers. Again, this aspect of Protégé’s G.L.c. 93A, §11, claim also arises out of Colameta’s alleged violation of the 2007 Employment Agreement, and, for the same reasons as above, cannot survive the defendants’ motion. The defendants’ motion is thus ALLOWED on this basis as well.[26]
ORDER
For the foregoing reasons, Colameta and Monument’s motion for summary judgment is ALLOWED, and Protégé’s motion for summary judgment is DENIED.

 JUDGE KIRPALAM — Exhibits with this designation are on the CD only. Exhibits designated as “Exhibit_to Joint Appendix of Exhibits” are in the bound hard copy of exhibits.

 The Asset P&S expressly provides that “[e]ach of the [Black Diamond employees] shall enter into an employment contract with [Protégé], and [Protégé] shall enter into an employment contract with each [Black Diamond employee] ...” Tab C to Protégé’s Motion.

 Protégé’s president Michael Ivers testified at his deposition that even though he was dissatisfied with the amount of business that Colameta was bringing to Protégé, he wanted Colameta to remain at Protégé because he was concerned that Colameta would “[steal] back all of the customers he had sold [to Protégé pursuant to the Asset P&S] and everybody else he could get his hands on.” Tab P to Protégé’s Motion, at 143.

 In his August 2011 affidavit, Colameta explains the “different payout structure for [his] commissions.” Exhibit I to Joint Appendix of Exhibits, par. 10. The 2007 Employment Agreement “modified the percentage of company revenue [he] received from 1% percent [sic] of on-going business to: 0.02% of total company revenue, as well as additional payouts for service revenue as a result of Oracle license sales, new business service revenue, net new application support revenue, and overall company profits — as those terms were defined in the” 2007 Employment Agreement. Id.

 In his August 2011 affidavit, Colameta speculates that his yearly commissions would be in this range. Exhibit I to Joint Appendix of Exhibits, par. 18. Protégé does not dispute that Colameta “had the potential to earn” commissions in this range. Protégé’s Response to Statement No. 21.

 By the end of the first quarter of 2009, Protégé instituted a new, profitability-based commission plan. Colameta was involved in developing this new commission plan which, according to his deposition testimony, applied only to Protégé consultants and not to himself.

 Protégé alleges that although it instituted a company-wide pay reduction of at least 10%, it made an exception for a consultant, Raman Singh, who had a particular skill with a certain Oracle software tool; Protégé initially reduced Raman Singh’s salary then reinstated it to the prior level. The defendants dispute that Raman Singh’s salary was ever reduced.

 According to Ivers, these negotiations had begun in January or February 2008. The Letter of Intent from CTE is dated June 6, 2008. Exhibit M to Joint Appendix of Exhibits.

 In his September 2011 affidavit, Colameta states that, during the negotiations with CTE, he relinquished his unvested stock options as part of the transaction; after the deal terminated, “the original stock options which [he] previously relinquished in connection with the acquisition were never regranted or otherwise returned to [him].” Tab X to Protégé’s Motion, at pars. 5, 7.

 See Tab W to Protégé’s Motion (internal Protégé e-mail setting out three management groups headed by Ivers, Chiappini, and Colameta).

 In his deposition, Colameta testified that he began his job search prior to July 2008, before Protégé reduced his salary. Through his discussions with potential employers, Colameta learned that the 2007 Employment Agreement would be unenforceable if Protégé reduced his salary. Tab A (part 2) to Protege’s Motion, at 126-27.

 Colameta understood that Protégé maintained a backup of its employees’ laptops, and that Protégé maintained a central e-mail server that backed up the Protégé e-mail system.

 Ivers testified in his deposition that these customers told him that Colameta himself informed them that he was leaving Protégé; Colameta testified in his deposition that he did not inform anyone of his departure until after he started working at Monument.

 The date on which Colameta started working at Monument is unclear. There is evidence that his first day was March 23, 2009, Tab A (part 2) to Protégé’s Motion, at 206; Tab J to Protege’s Motion; and there is evidence that his first day was April 1, 2009. Exhibit E to Joint Appendix of Exhibits, at 112; Exhibit I to Joint Appendix of Exhibits, par. 22; Tab N to Protégé’s Motion. This dispute is immaterial.

 Rubin testified in his deposition that Monument had engaged in some sales activities with AS&E and DeLorme before Colameta joined Monument, but that Monument did not close on any work with those companies until after Colameta joined. Tab A (part 5) to Protégé’s Motion, at 116, 122. Rubin also testified that Monument had worked on several projects with The Mentor Network before Colameta joined Monument. Tab O to Protégé’s Motion, at 120.

 Protégé alleges that all of these entities were Protégé clients at the time Colameta contacted them. The defendants dispute that these entities had active contracts or billing relationships with Protégé at that time, except they admit that Massachusetts Biologic Laboratories received its last invoice from Protégé and a proposal from Monument in August 2009, *136 and that it did not enter into a contractual relationship with Monument until October 2010. Beckman Coulter (previously known as Agencourt), DeLorme, The Mentor Network, and The Siemon Company appeared on the list of Customer Contracts attached to the Asset P&S which Protégé purchased from Black Diamond.

 Monument had a contract with Hope Global before Colameta began working there. Protégé contends that Monument’s business with Hope Global increased after Colameta began working at Monument. Rubin testified to the contrary in his deposition. Tab A (part 5) to Protégé’s Motion.

 Of these entities, Protégé alleges that all but Ariad, Candela, and SunLife were Protégé clients at the time they became Monument customers; the defendants dispute that any of these entities had active contracts or billing relationships with Protégé at that time. Beckman Coulter, DeLorme, Hope Global, and The Mentor Network appeared on the list of Customer Contracts attached to the Asset P&S which Protégé purchased from Black Diamond.

 At his deposition, Colameta explained that he took these proposals with him when he left Protégé because “a couple of clients had made reference to the fact that they [the proposals] were well put together, and it represented [his] writing . . . [He] felt that it was something that [he] could use going forward.” Tab Q to Protégé’s Motion, at 94-95. Colameta also explained that the information in these proposals was not confidential, but rather “is known in the industry” and “developed from a conversation that you have with somebody.” Tab Q to Protégé’s Motion, at 89, 95.

 The provisions in the 2004 Employment Agreement permitting termination of employment by Colameta’s death and by incapacity are also absent from the 2007 Employment Agreement.

 As the 2004 Employment Agreement expired by its terms before the parties executed the 2007 Employment Agreement, the 2007 Employment Agreement was not a modification of the 2004 Employment Agreement, but a new contract. See Dynamic Mach. Works, Inc. v. Machine & Elec. Consultants, Inc., 444 Mass. 768, 771 (2005) (“Amodification ‘is the changing of the terms of the agreement which may diminish or increase the duty of either party.’ ” (citation omitted)).

 Protégé’s argument that the economic downturn that began in 2008 excuses its reduction of Colameta’s salary is unavailing. Protégé has not supported its position with case law, and its attempt to distinguish the cases the defendants have relied on is unsuccessful. This court finds persuasive the federal district court’s reasoning in Wagner & Wagner Auto Sales, Inc. v. Land Rover N. Am., 539 F.Sup.2d 461 (D.Mass.), aff'd 547 F.3d 38 (1st Cir. 2008), that “economic downturns and market shifts are not the type of risks that are ‘so unusual and have such severe consequences that they must have been beyond the assignment of risks inherent in the contract Id. at 472, quoting Mishara Constr., Inc. v. Transit-Mixed Concrete Corp., 365 Mass. 122, 129 (1974). Further, the Depression-era cases that the defendants have supplied render unconvincing Protégé’s argument that the economic crisis that began in 2008 was more catastrophic than “the normal ebb and flow of consumer demand in a market-based economy” that existed at the time the Wagner case was decided. Id.: see, e.g., Escher v. Harrison Security Co., 79 F.2d 777, 782-83 (9th Cir. 1935) (discerning no merit in defaulting lessee’s contention that, “because there exists a deep financial and economic depression, judicially recognized as affecting all interests in the communfly, the lessor . . . should be deprived either of the immediate right to its rentals or to its property”); California Security Co. v. Grosse, 3 Cal.2d 732, 733 (1935) (rejecting defendants’ argument “that the prevailing economic depression made payment of their loan impossible," because “[t]hat the depression cannot constitute a defense to a foreclosure proceeding is clear”); Marionneaux v. Smith, 163 So. 206, 208 (La. 1935) (rejecting defendant’s argument that, given “the extraordinary and world-wide financial panic!,]” compliance with contract would have caused him to suffer a loss, because “financial panic . . . involved business in general” not only the parties’ business, so why “should defendant be relieved from a burdensome obligation and taking a loss when millions of others perhaps had to suffer likewise”).

 In its motion for summary judgment Protégé claims that Counts I and v. implicate conduct separate from the 2007 Employment Agreement and therefore survive a conclusion that Colameta is discharged from his obligations under that agreement. These arguments fail.
First, Protégé contends that Count I refers to Colameta’s breach of the implied covenant not to compete that arose out of Colameta’s sale of Black Diamond to Protégé. Count I in Protégé’s Verified Complaint, however, mentions only the non-competition and non-solicitation covenants contained in the 2007 Employment Agreement. Moreover, no implied covenant could have arisen out of Colameta’s sale of Black Diamond to Protégé in 2004 because, simultaneous with that sale, Colameta became an employee of Protégé and entered into the 2004 Employment Agreement which contained an express covenant not to compete.
Second, Protégé argues that Countv. concerns Colameta’s breach of his fiduciary duty of loyalty and duty of good faith and fair dealing to Protégé, both of which arise out of Colameta’s employment at Protégé rather than the 2007 Employment Agreement. The language in the Verified Complaint, however, could not be clearer: first, it is titled “Breach of Agreement”; second, it alleges that Colameta and Protégé entered into the 2007 Employment Agreement which is enforceable; third, it alleges that “Colameta breached the January 1, 2007 Employment Agreement by violating the covenants in said Agreement as described above”!;] and fourth, Protégé sought a declaration that “Colameta is bound by this agreement and is in violation thereof’ and damages “for Colameta’s breach of this Agreement.”

 In its motion for summary judgment, Protégé contends that this claim states both the common-law tort of misappropriation of trade secrets as well as a violation of G.L.c. 93, §42, which provides, “Whoever embezzles, steals or unlawfully takes, carries away, conceals, or copies, or by fraud or by deception obtains, from any person or corporation, with intent to convert to his own use, any trade secret, regardless of value, shall be liable in tort to such person or corporation for all damages resulting therefrom.” The Verified Complaint does not mention this statute. This omission is of no consequence, however, because courts have found that the statutory and common-law claims are “essentially equivalent.” Incase Inc. v. Timex Corp., 488 F.3d 46, 52 n.10 (1st Cir. 2007).

 Even a very liberal reading of Count VII does not support Protégé’s argument that, with this claim, it alleges that Monument violated G.L.c. 93A by misappropriating Protégé’s trade secrets. Count VII states, in pertinent part, “By hiring Colameta and employing him as President, Monument had full knowledge of Colameta’s covenants in his Employment Agreement and, by permitting Colameta to be employed, to sell Products similar to or in competition with Protégé’s and to solicit former Protégé customers in violation of these covenants, Monument has engaged in acts which constitute unfair or deceptive acts or practices in knowing or willful violation of M.G.L.c. 93A, §§2 and 11.” Verified Complaint, at par. 55 (emphasis added). This language does not allude to misappropriation of trade secrets. Moreover, while Count VII itself “incorporates by reference” the paragraphs that appear before it, Count VIH alleging misappropriation appears after the G.L.c. 93A count and is therefore not incorporated by reference into it.